UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREDERICK GEIB,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL NO. 1:CV-04-1923** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **JEFF JAMES, <u>et</u> <u>al</u>.,** | : | |
| | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

I.     **Introduction**

        Plaintiff, Frederick Geib, is an inmate at the State Correctional Institution in Waymart

("SCI-Waymart"), Pennsylvania.  He filed this civil rights action on August 30, 2004,

pursuant to 42 U.S.C. § 1983 alleging inadequate medical treatment for his injured hand in

violation of the Eighth Amendment.  Named as Defendants are the following SCI-Waymart

officials: Jeff James, Unit Manager; Dr. Bekele, prison physician; Mrs. Loomis, physician's

assistant; and Donald Fiske, Health Care Administrator. As relief Geib seeks proper

medical treatment, physical therapy, evaluation by a medical expert and compensatory

damages.

        On October 4, 2005, a Memorandum and Order was issued wherein motions to

dismiss the complaint filed by Defendants James, Loomis and Fiske were granted.  (Doc.

73.)  A motion to dismiss filed by Defendant Bekele was denied.  Presently before the court

is Bekele's motion for summary judgment.  (Doc. 142.)  Also pending are the following

motions filed by Plaintiff: (1) motion to sustain the action[1] (Doc. 143); (2) motion to quash Defendant's brief in support of summary judgment and statement of uncontested facts (Doc. 147); (3) motion for leave to file brief in opposition to the summary judgment motion (Doc. 153); and (4) motion for the appointment of counsel (Doc. 157).

## II.    Statement of Facts

On October 22, 2002, while proceeding to his prison job, Plaintiff injured his hand when he attempted to open a door at the same time another inmate was coming through the door.  Plaintiff was provided with an ice pack and Motrin by a nurse in the prison medical department.  (Doc. 144, Ex. B, Geib Dep. at 10.)  Plaintiff put in a sick call slip for the next day and returned to work.  The following day, Defendant Bekele examined Plaintiff, ordered x-rays of his wrist and planned for an orthopaedic consult.  (Id., Ex. C, Progress Notes.)   On October 24, 2002, x-rays of the wrist were taken and Plaintiff was informed the next day by Bekele that he had a broken bone and would be seeing an outside specialist for treatment. (Id., Ex. B at 23-24.)  On the same date, Bekele wrote a consultation referral for Plaintiff to see Dr. Mogerman, an orthopaedic surgeon.  The referral was approved on October 26, 2002, and the appointment scheduled for October 31, 2002.  (Id., Ex. E, Consultation Record; Ex. D.)  The consultation referral noted:"Injury to Rt. wrist and x-ray showed fracture of navicular with avulsion."  (Id.)

On October 31, 2002, Dr. Mogerman examined Plaintiff, reviewed the x-rays from

---

[1] While labeled as "Plaintiff's Dispositive Motion" it is clear Plaintiff intended this document to be a brief in opposition to Defendant's pending motion for summary judgment. Although Plaintiff filed the opposition prior to the time Defendant submitted a brief in support of the summary judgment motion, Plaintiff has since filed a supplemental opposition brief.  (Doc. 146.)  As such, the court will construe both filings by Plaintiff to be his opposition to the summary judgment motion.

the prison and placed a cast on his hand.  (Id., Ex. B at 27.)  Mogerman's examination report noted his initial impressions of an acute contusion/sprain injury of the right wrist and hand, and to "rule out occult fracture right wrist and hand region."  (Id., Ex. E.) The report further stated that Plaintiff had a chronic non-union of an old right scaphoid fracture, and noted that he had reviewed Plaintiff's radiographs on the right wrist with the left side for comparison. . .", indicating that Mogerman had two different x-rays at the time of the exam.[2]  He further concluded that no significant fracture was detected. It was noted that Plaintiff was to be seen for a follow-up in 7-10 days. (Id.)

On November 1, Bekele wrote for a follow-up visit for Plaintiff with Dr. Mogerman, which was scheduled for November 11, 2002.  (Id., Ex. E at 11/11/02; Ex. C at 1/1/02 and Ex. D at 11/6/02.)  Plaintiff was examined by Mogerman on November 11, 2002.  The original cast was removed and, according to Mogerman's notes, a new short-arm cast was applied.  Plaintiff was to continue under the current care plan and return in 4-6 weeks. (Id., Ex. E.) Plaintiff alleges that he was sent back to Mogerman on this occasion because the wrong x-rays had been sent on the first visit.  (Doc. 1, Compl. at 5.)  He claims that because of the error, Mogerman took a new x-ray and replaced the original cast with a new cast which covered his thumb and hand.  (Doc. 144, Geib Dep. at 30.) According to Plaintiff, Mogerman told him the bone was separated and that "a break in that area didn't get a good supply" which is why he positioned the thumb the way he did in the new cast. (Id.)

On November 13, 2002, Bekele ordered 500 mg of Naprosyn for pain.  On

---

[2]  It thus appears that at the time of the exam Dr. Mogerman may have had both the current x-rays of the right hand and a prior x-ray of Plaintiff's left hand.

November 22, 2002, Bekele saw Plaintiff for complaints of "pain using the right hand in cast." He wrote for a follow up referral with Dr. Mogerman noting "Follow up of navicular fracture in cast," with the appointment scheduled for December 9, 2002. (Id., Ex. E at 12/9/02; Ex. D at 11/22/02.) On December 4, 2002, Bekele ordered another course of 500 mg Naprosyn for Plaintiff. (Id., Ex. D at 12/4/02.)

At the December 9, 2002 appointment, Mogerman informed Plaintiff that the bone was not healing, and recommended that a bone graft be performed. (Id., Ex. B at 36-37.) Plaintiff was informed that Mogerman would perform the surgery which would be scheduled at the next available time. (Id. at 37-38.) At this appointment, his cast was also removed, and an ace bandage was applied. Plaintiff was also instructed to begin exercises on his own. (Id., Ex. E at 12/9/02.)

Prior to surgery Plaintiff was seen on several occasions by Mogerman, Bekele and Dr. Stanish, another prison physician. Stanish saw Plaintiff of December 16, 2002, in response to complaints of pain in his right wrist. Naprosyn was ordered for Plaintiff and a referral written to see Dr. Mogerman, scheduled for January 27, 2003. (Id., Exs. C, D at 12/16/02; Ex. E at 1/27/03.) On December 19, 2002, Bekele wrote another order for 500 mg of Naprosyn for 15 days. This order was renewed on January 2, 2003, and again on January 28, 2003. (Id., Ex. C at 1/2/03 and 1/28/03; Ex. D at 12/29/02.)

On January 27, 2003, Mogerman examined Plaintiff and noted "painful non-union right scaphoid." (Id., Ex. E at 1/27/03.) In the examination record, Mogerman noted Plaintiff's desire to proceed with the bone graft as previously discussed. (Id.)

On January 31, 2003, Plaintiff's bone graft surgery was scheduled to take place on March 26, 2003 at Marian Community Hospital. (Id. Ex. C at 1/31/03). On March 3, 2003,

4

further pain medication was ordered by a physician's assistant at the prison.  On March 26,

2003, Plaintiff was taken to Marion Community Hospital where Dr. Mogerman performed

the surgery.  (Id., Ex. F.)  Plaintiff was returned to the prison later that evening. (Id., Ex. B

at 39-42.) Upon return, he was examined by Bekele and admitted to the prison infirmary.

(Id., Ex. C at 3/27/03; Ex. D at 3/26/03.)

On March 28, Bekele ordered 600 mgs of Motrin for 30 days.  On April 2, 2003, he

ordered for Plaintiff the antibiotic Kefelx, as well as a 7 day course of MS-Contin for pain.

(Id.)  Bekele also scheduled a follow up with Dr. Mogerman for April 14, 2003.  (Id., Ex. E at

4/14/03.) At this appointment, Mogerman x-rayed Plaintiff's wrist and noted that the clinical

and x-ray exams were satisfactory at the bone graft and graft donor site.  It was also noted

that a "new long-arm thumb spica cast" was applied. (Id., Ex. E at 4/14/03.)

On April 15, 2003, Bekele wrote for a consultation referral with Dr. Mogerman, which

was scheduled for May 5, 2003.  At this appointment, Plaintiff was examined, his x-rays

reviewed and a short-arm thumb spica cast was applied.  Plaintiff saw Mogerman again the

following day after complaints that the cast was too tight.  The cast was split and the area

re-wrapped with fiberglass to give Plaintiff more room.  (Id., Ex. E, 5/6/03 Report &

Consultation Record.)

On May 9, 2003, Bekele wrote another follow up consultation referral for Plaintiff to

see Mogerman for June 16, 2003.  On said date, he was examined and x-rayed.

According to Plaintiff, Mogerman informed him he wanted to put a splint on and that he had

called the prison and was told by someone there that a splint was available for Plaintiff.

(Doc, 144, Ex. A, Compl. at 5; Ex. B, Geib Dep. at 46-48.) Plaintiff was returned to the

prison at that time wearing an ace bandage.  In the notes from Mogerman's consultation

record from this visit, however, it is noted that an exam was conducted and x-rays taken, however there is no mention of or order for the use of a splint.  (Doc. 144, Ex. E, Consultation Record at 6/16/03.) Plaintiff states that upon his return to the prison, a nurse informed him that the prison did not have the particular splint he wants and one would have to be ordered.  (Id., Ex. B at 48-49.)

On June 17, 2003, Bekele wrote an order for a "cock-up splint" to be worn by Plaintiff for 90 days.  (Id., Ex. D at 6.17.03; Ex. G at ¶ 9.)  Plaintiff states that while waiting for the arrival of the splint, he reinjured his hand, believing he possibly did so during the night while he was sleeping.  (Id., Ex. B at 50.)  He saw physician's assistant Heffernan at the prison who wrote a referral for Dr. Mogerman, which was approved by Defendant Bekele.  On June 23, 2005, Mogerman x-rayed Plaintiff's hand and placed it in another cast.  Mogerman noted that there was pain and swelling in the right wrist indicating a sprain, and that a short-arm cast was applied.  (Doc. 144, Ex. E, Consultation Record at 6/23/06.)  Upon his return to the prison, Bekele ordered Tylenol III for Plaintiff's pain. (Id., Ex. D at 6/23/03.)

On June 27, 2003, Bekele wrote for a consultation follow up with Mogerman, scheduled for July 28, 2003.  While there is no indication an appointment was held that day, a follow up exam with Mogerman was conducted on August 18, 2003.  (Id., Ex. E, Notes 8/18/03.) Mogerman noted that 4½ months had passed since the bone graft surgery and the alignment of the wrist was excellent. Plaintiff had a dull ache with mild swelling and tenderness.  The fracture line was not 100% resolved yet.  His treatment plan was to apply a brace that the prison had obtained, as well as have Plaintiff perform light exercises.  (Id.)

Defendant Bekele saw Plaintiff again on September 5, 2003 with regard to his wrist

6

progress and noted that he would be using the wrist brace as recommended by Mogerman. He wrote for further x-rays of the wrist in two weeks.  The x-rays were taken on September 16, 2003. (Id. at 9/5/03; 9/16/03.) On September 19, 2003, Bekele wrote for Plaintiff to continue wearing the wrist brace for 30 additional days.  (Id. at 9/19/03.)

Plaintiff was seen again by Mogerman on September 29, 2003.  Mogerman noted ". . . there was not mature union of the scaphoid fracture evident" and offered Plaintiff the option of surgical intervention.  Plaintiff agreed to the surgery which was to be scheduled as soon as the elective list permitted.  (Id., Ex. E at 9/29/03.) On September 30, 2003, Defendant Bekele set up the follow up with Mogerman for the scheduling of Plaintiff's arthroscopy.  (Id., Ex. C.)  On October 15, 2003, Bekele wrote an order for Plaintiff to continue with the wrist brace for another 180 days.

The second surgery was performed on October 24, 2003, by Mogerman.  A short-arm cast was applied, and Plaintiff returned to the prison later that day.  (Id., Ex. C at 10/24/03.)  He was admitted to the infirmary.  On October 24, 2003, he was prescribed antibiotic and pain medications by Dr. Stanish.  Further medications were prescribed the following day.  (Id., Ex. D.) On October 27, 2003, Plaintiff was seen by Bekele who noted that he was to followup with Dr. Mogerman on November 10, 2003.  At this time he was discharged back to the block.  Bekele also ordered additional pain medication for Plaintiff. (Id., Ex. D at 10/27/03.)

On November 10, 2003, Plaintiff had a follow up visit with Mogerman who removed his staples and applied a new cast.  Satisfactory progress was noted and Plaintiff directed to return in 4 weeks to have the pins in his wrist removed.  Bekele arranged this appointment for December 8, 2003.  (Id., Ex. C at 11/12/03; Ex. E at 11/14/03.)  He also

7

prescribed Prednisone and a 4 day course of Tylenol III for Plaintiff on December 4, 2003. (<u>Id</u>., Ex. D at 12/4/03.)  At the December follow up appointment with Mogerman, the pins were removed, the hand was x-rayed and a short-arm cast was applied.  Plaintiff's progress was noted as satisfactory.  Another follow up appointment was arranged by Bekele for January 14, 2004.  He also ordered x-rays of Plaintiff's hip. (<u>Id</u>, Ex. D at 12/9/03.)  Defendant Bekele saw Plaintiff again on December 11, 2003, at which time he ordered Plaintiff to continue using the Electrical Bone Stimulator for 10 hours per day for 6 additional weeks.

Plaintiff was next seen in a follow up appointment with Mogerman on January 19, 2004, at which time the cast was replaced with a short-arm splint to be used full-time.  The next follow up appointment was written by Bekele and scheduled for March 3, 2004.  At said appointment Mogerman noted Plaintiff's satisfactory progress and encouraging x-ray results.  Use of the splint was also recommended.  Because some degree of arthritis was detected, Tylenol as needed was advised for pain.  Re-examination was recommended in 4 weeks.  (<u>Id</u>., Ex. E, Consultation Report at 3/3/04.)

On the same date, Bekele set up Plaintiff's follow up appointment for April 12, 2004. As per Mogerman's recommendations, Bekele ordered the discontinuation of the wrist brace.  Plaintiff was examined by Bekele on March 25, 2004, in response to complaints for pain.  Ultram was prescribed for pain.  (<u>Id</u>., Exs. C and D at 3/25/04.)  Mogerman saw Plaintiff on April 12, 2004, and conducted an exam and x-rays.  The incision was noted as "well-healed" with Plaintiff's range of motion noted as limited with minimal irritability.  He was directed to use the electrical bone stimulator and return for a visit in 6-8 weeks. (<u>Id</u>., Ex. E at 4/12/04.)  Bekele wrote the next follow up visit for June 14, 2004.  On April 28,

2004, a further 6 week course of the wrist stimulator was ordered by a prison physician's assistant.  Plaintiff was thereafter examined by Mogerman on June 14, 2004. Improvement in both Plaintiff's range of motion and x-ray results were noted. Mogerman also remarked on Plaintiff's mild symptoms.  (Id., Ex. E at 6/14/04.)

On June 15, 2004, Bekele wrote an order for a 30 day course of Naprosyn for Plaintiff.  Two days later he wrote for another follow up visit with Mogerman, which was scheduled for June 28, 2004.  At this appointment Mogerman noted "incremental satisfactory improvement" at both the right hand/wrist as well as the graft donor site. Naprosyn was recommended for any pain and Plaintiff directed to return in 2 months. (Id., Ex. E at 6/28/04.)

On July 1, 2004, Bekele wrote an order for Plaintiff's use of an ace bandage for 180 days and also set up the next follow up visit with Mogerman.  The appointment was held on August 30, 2004.  Mogerman noted that Plaintiff's functional range of motion was limited to about 50% and that the alignment of the wrist was excellent.  (Id. at 8/30/04.) He requested to see Plaintiff back in 8-10 weeks.  As of the end of August 2004, Bekele was no longer employed at SCI-Waymart.  He had no further involvement in the medical care and treatment of Plaintiff.  (Doc. 144, Ex. G at ¶¶ 2-4.)

According to Plaintiff, some time after the removal of his cast in January of 2004, Mogerman told Plaintiff there was nothing further he could do for him.  He states that Mogerman wanted to send him to see a "subspecialist" and that he was "going to ask the jail if that could be done." (Id., Ex. B at 67-69.)  Plaintiff states that while Mogerman wants him to see a specialist, the prison won't allow it.  He does not know whether Mogerman ever discussed the issue of the second specialist with Defendant Bekele.  (Id., Ex. B, Geib

9

Dep. at 69, 74.)  Plaintiff states that he discussed this issue with Bekele, who informed him that it was not the prison, but rather, the insurance company that will not allow him to see another specialist.  (Id. at 73.)

Plaintiff claims that his hand is no better and that he has endured unnecessary pain and suffering because he is in prison.  Defendant Bekele moves for summary judgment on these claims.  The motion is ripe for disposition.

### III.    Motion for Appointment of Counsel

Pending is Plaintiff's seventh motion seeking the appointment of counsel in this matter.  (Doc. 157.)  The motion is fully briefed and will be denied without unnecessary elaboration for the following reasons.  In requesting counsel, Plaintiff sets forth the same arguments previously considered and rejected by the court.  These arguments include his lack of legal knowledge, GED level education, complexity of the issues involved and need for investigation and witnesses.  The court has previously found Plaintiff to have the ability to represent himself in this action.  The issues involved are not complex.  The case has one remaining defendant who has filed a summary judgment motion.  Plaintiff has filed opposition to the motion which is presently ripe for consideration by the court. Circumstances have not changed since the denial of Plaintiff's previous motions which would now warrant the appointment of counsel in this matter. Accordingly, for the reasons set forth in the court's prior orders, the motion will be denied.

### IV.    Plaintiff's Motion to Quash Brief in Support of Summary Judgment

Plaintiff has filed a motion to quash Defendant Bekele's brief in support of the summary judgment motion and all supporting documents.  (Doc. 147.)  He first argues that

Defendant's supporting brief consists of 196 pages.  He then generally asserts that Defendant has set forth a "blatant misrepresentation of the facts to mislead this court."  (Id. at 1.)  He further argues that Defendant has failed to turn over discovery in this action.  He then proceeds to reargue the allegations in his complaint.

Plaintiff's motion will be denied for the following reasons.  First, Defendant's brief is not 196 pages in length.  Rather, the supporting brief is 13 pages.  The Statement of Material Facts is 19 pages in length and consists of 111 numbered paragraphs.  The exhibits in support of the motion consist of 168 pages.  These exhibits are directly related to the issues pending before the court.  While Plaintiff also contends that Defendant has deprived him of discovery responses, his remedy was to file a motion to compel discovery and a supporting brief setting forth the specifics with regard to the requests.  The record reveals that Plaintiff did not do so.  Further, although Defendant states that no discovery requests were ever served upon him, a review of Plaintiff's reply brief on the Motion to Quash reveals that Defendant at least did receive and respond to a short Request for the Production of Documents.  However, there is no evidence that any further discovery requests were ever served.  More importantly, Defendant states that all documents within his possession relevant to this matter have been submitted to the court as exhibits to the pending motion for summary judgment.

Plaintiff also argues that the supporting brief should be quashed because it was not filed within ten 10 days of the motion for summary judgement.  A review of the docket reveals that the motion was filed on March 17, 2007.  The supporting brief was filed on March 29, 2007.  Pursuant to Fed. R. Civ. P. 6(a), the brief was timely.  A supporting brief is due within ten 10 days, however, under Rule 6(a), if the time period for filing is less than

11

11 days, intermediate Saturdays and Sundays are not counted.

Finally, Plaintiff's general allegation of misleading information in the supporting brief is not well-taken.  Defendant sets forth his undisputed facts and submits evidentiary materials in support of those facts.  To the extent Plaintiff disagrees, it is his duty to demonstrate that there is a genuine issue of material fact for trial.  For these reasons, the motion to quash will be denied.

**V.      Summary Judgment Motion**

      **A.      Legal Standard**

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment.  The substantive law determines which facts are material.  Id. at 248.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 250.  If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'."  Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)(citing First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289 (1968)).  All inferences, however, "'should be

drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true'." Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 512 (3d Cir. 1994)(citing Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Wicker v. Consol. Rail Corp., 142 F.3d 690, 696 (3d Cir. 1998).

The moving party bears the initial responsibility of stating the basis for its motion, identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  As a general rule, unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).  The moving party must present competent evidence to support his version of events.  Likewise, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)).  The nonmoving party cannot "simply reassert factually unsupported allegations contained in [the] pleadings."  Williams, 891 F.2d at 460 (citing Celotex, 477 U.S. at 325).  "Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, the nonmoving party ... 'must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file'."  Pastore, 24 F.3d at 511 (citing Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  If the evidence in favor of the nonmoving party is merely colorable or not significantly probative, summary judgment should be granted.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998)(citing Matsushita Elec. Indus., Co. v. Zenith

13

Radio Corp., 475 U.S. 574, 586 (1986)).

### B.   Analysis

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)(citing Estelle v. Gamble, 429 U.S. 97 (1976)).  To establish a medical claim based on the Eighth Amendment, an inmate must allege (1) acts or omissions by prison officials sufficiently harmful (2) to evidence deliberate indifference to a serious medical need.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).  The inmate must satisfy this two-part, conjunctive test. Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference.  See Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).

To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety.  Farmer, supra, 511 U.S. at 837-38.  Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment ...." Estelle, 429 U.S. 97 (1994).  It also follows that an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

With these principles in mind, the court will now address the summary judgment motion.  Plaintiff contends that he received inadequate medical care from Defendant Bekele with respect to the hand injury he sustained on October 22, 2002.  He basically asserts Bekele was deliberately indifferent to his medical needs when: (1) the wrong x-rays were sent to Dr. Mogerman; (2) Dr. Mogerman was incorrectly informed that splints were

14

available at the prison; and (3) referral to a second outside specialist was not permitted.  In

support of the motion for summary judgment, Defendant submits a copy of Plaintiff's

Complaint; Plaintiff's Deposition Transcript; the DOC's medical records including Progress

Notes and Physicians' Orders for the relevant time period; and the Consultation Records of

Dr. Mogerman, the outside specialist.  These submissions reveal that the day Plaintiff was

injured, he was seen and treated almost immediately.  He received ice and Motrin, and his

hand was x-rayed and bandaged the following day.  On October 31, 2002, he was sent to

see the outside specialist, who examined and casted his hand.

      Plaintiff contends the wrong x-rays were sent to Dr. Mogerman, which resulted in the

recasting of his injury.  Even assuming the record established that the wrong x-rays were

sent to Mogerman on Plaintiff's first visit, the record is void of any evidence establishing

that Defendant Bekele was responsible for doing so.  Plaintiff himself does not claim it was

Bekele who sent the wrong x-rays.  In fact, in his deposition he states that he has no

information as to who was responsible for sending the wrong x-rays to Mogerman, and has

no reason to believe or evidence to support that it was Bekele.  (Doc. 144, Ex. B at 34.)

Further, to the extent Plaintiff seeks to hold Bekele responsible on the basis that he was

the Medical Director at SCI-Waymart during the relevant time period, his claim is wholly

without merit.  It is well-established that <u>respondeat</u> <u>superior</u> cannot serve as the basis for

liability in a § 1983 civil rights action.  <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1208 (3d

Cir. 1988).  Clearly, Defendant is entitled to summary judgment on this claim as no dispute

of fact exists in the record.  Bekele was not involved in the process of gathering of records

and films sent with an inmate to an appointment with an outside specialist.  There is no

evidence that wrong x-rays were even sent.  Even if they were, there is no evidence that it

15

was by Bekele.  Further, even if wrong x-rays were sent and it somehow was through the fault of Bekele, there is no evidence establishing that such error was anything more than negligence, which is not actionable in a civil rights action.  See Estelle, 429 U.S. at 106.

The record also demonstrates no disputed issue of fact with respect to the issue of the splint.  When the cast was removed by Mogerman following the first surgery, Plaintiff contends that Mogerman sent him back to the prison with his hand un-splinted because someone at the prison told Mogerman that the prison had a splint for Plaintiff.  Plaintiff states there was no splint for him at the prison, and that he had to wait several weeks while one was ordered for him.  During this time, he reinjured his hand.  Other than his own testimony that Mogerman spoke with "someone" at the prison about a splint, there is no evidence to support Plaintiff's belief that someone at the prison told Mogerman a splint was available.  More importantly, the record contains no evidence that even if Mogerman did speak with someone at the prison, that it was Bekele, or that Bekele had any role in obtaining a splint for Plaintiff.  In fact, Plaintiff states in his deposition that he has no idea with whom Mogerman spoke at the prison and who at the prison was responsible for telling him a splint was available.  (Doc. 144, Ex. B at 47-48.)

Finally, Plaintiff claims that Bekele was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when he would not permit him to see a second outside specialist.  Plaintiff states that at some point Dr. Mogerman wanted to send him to see another specialist but was told "the prison wouldn't allow it."  In his own deposition testimony, Plaintiff admits that he does not know if Mogerman ever even discussed the issue of another specialist with Defendant Bekele.  (Doc. 144, Ex. B at 69, 74.)  Further, although Plaintiff states that he personally discussed this issue with Bekele, he states that

16

Bekele told him it was <u>not</u> the prison, but rather the insurance company that would not agree to a second specialist.  (<u>Id</u>., Ex. A at 5.)  Simply stated, the record contains no evidence that: (1) Mogerman ever discussed a second referral with Bekele; (2) even if such a referral request existed, that Bekele considered and denied such a request; and (3) if he did deny such a request, such denial was the result of deliberate indifference.  Accordingly, summary judgment is warranted on this claim as well.[3]

Contrary to Plaintiff's unsupported assertions[4], the undisputed facts contained in the record fail to demonstrate Defendant Bekele acted with deliberate indifference to the serious medical needs of Plaintiff.  The facts as set forth earlier show that Bekele provided Plaintiff with medical care and treatment from the time he injured his hand in October of 2002, through the time Bekele left his position at SCI-Waymart in August of 2004.  Plaintiff has failed to adduce any evidence with respect to the conduct of Bekele which might be said to establish, even at best, a disagreement as to the course of medical care let alone deliberate indifference.  Accordingly, the motion for summary judgment will be granted.  An

---

[3]  Plaintiff also filed a "Motion for Leave to Respond to Defendant's Reply Brief" regarding the motion for summary judgment.  (Doc. 153.)  This motion will be denied for the following reasons.  First, Plaintiff has filed two opposition briefs with regard to the motion.  In his motion to respond to Defendant's reply brief, he does not articulate any argument made by Defendant that fell outside the scope of either the motion or Plaintiff's opposition thereto.  The purpose of a sur-reply is to address any new issues or legal bases which are asserted for the first time in a reply brief and which Plaintiff would not have had a prior opportunity to address.  Such is not the case here.  The motion is without merit.

[4]  In opposing Defendant's motion, Plaintiff relies on the allegations set forth in his complaint.  While he does cite to the medical records and deposition testimony submitted by Defendant, he submits no additional opposing evidentiary materials.

appropriate Order follows.

Dated: August       , 2007     _____

_____        A. RICHARD CAPUTO
                                                 United States District Judge

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**FREDERICK GEIB,**                                   :
                                                            :
      **Plaintiff,**                          :   **CIVIL NO. 1:CV-04-1923**
                                                            :
   **v.**                                            :   **(Judge Caputo)**
                                                            :
**JEFF JAMES, et al.,**                          :
                                                            :
     **Defendants.**                         :

# O R D E R

    **AND NOW, THIS**       **DAY OF AUGUST, 2007,** in accordance with the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

    1.    Plaintiff's "Motion to Sustain Action" (Doc. 143) is hereby construed to be a brief in opposition to Defendant's motion for summary judgment.  The Clerk of Court is directed to make the appropriate correction to the docket.

    2.    Plaintiff's Motion for Appointment of Counsel (Doc. 157) is **denied**.

    3.    Plaintiff's Motion to Quash Defendant's brief in support of summary judgment (Doc. 147) is **denied**.

    4.    Plaintiff's Motion for Leave to file a response to Defendant's summary judgment reply brief (Doc. 153) is **denied.**

    5.    Defendant Bekele's Motion for Summary Judgment is **granted**.  Judgment is entered in favor of Bekele and against Plaintiff on all claims.

    6.    The Clerk of Court is directed to close this case.

_____
                                  A. RICHARD CAPUTO
                           United States District Judge